## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NANCY L. TESTON,

       Plaintiff,

vs.                                         No.  03cv0499 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Teston's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 8]**, filed August 28, 2003 and fully briefed on November 10, 2003.  On November 20, 2002, the Commissioner of Social Security issued a final decision denying Teston's claim for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well not well taken and will be DENIED.

### I.  Factual and Procedural Background

Teston, now forty-nine years old, filed her application for disability insurance benefits on September 27, 2001, alleging disability since August 13, 2001, due to cardiomyopathy[1], asthma,

---

[1] In the majority of cases of dilated cardiomyopathy, the cause is not known.  Dilated Cardiomyopathy causes the heart to become enlarged and to function poorly.  For many affected individuals, Dilated Cardiomyopathy is a condition which will not limit the quality or duration of life.  However, a minority experience significant symptoms.  *See Cardiomyopathy Association, http://www.cardiomyopathy.org/html/which_card_dcm_text.htm.*

degenerative joint disease, and depression.  Tr. 16.  Teston has a general equivalency degree and past relevant work experience as cashier at a gas station, security guard, and cashier and snack bar manager at a bowling alley.  Tr. 19.  On November 20, 2002, the Administrative Law Judge (ALJ) denied benefits, finding Teston had "severe impairments, consisting of cardiomyopathy, asthma, degenerative joint disease and depression," but these impairments did not meet or medically equal one of the impairments listed in Appendix I, Subpart P, Regulations No. 4.  Tr. 16.  Specifically, the ALJ reviewed Listings 1.00 (Musculoskeletal System), 3.00 (Respiratory System) and 12.00 (Mental disorders).  *Id.*  The ALJ further found Teston retained the residual functional capacity (RFC) for sedentary work.  Tr. 18.  Finally, the ALJ found Teston's was not credible.  Tr. 16.  Teston filed a Request for Review of the decision by the Appeals Council.  On April 18, 2003, the Appeals Council denied Teston's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Teston seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards.  *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).  Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

3

impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Teston makes the following arguments: (1) the ALJ improperly rejected her claim that she met Listings 3.03 and 12.04; (2) the ALJ did not accord the proper weight to her treating physicians' opinions of disability; (3) the ALJ's credibility finding is not supported by substantial evidence; (4) the ALJ failed to fully consider her mental impairments; and (5) the ALJ erred when he failed to include all her limitations in his hypothetical questions to the vocational expert (VE).

## A.  Listings 3.03 and 12.04

Teston contends she submitted a "Notice of Claimant's Condition Falling Within a Listing," setting forth the evidence supporting her claim that she met Listings 3.03 and 12.04. Teston complains that "in the ALJ's decision, no significant consideration was made to said exhibit." Pl.'s Mem. in Supp. at 5. The ALJ's decision indicates he "specifically reviewed Sections 1.00, 3.00, and 12.00 of the listing-level impairments." Tr. 16.

Listing 3.03 states, in pertinent part:

3.03  Asthma, with:

B.  Attacks (as defined in 3.00C) in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks,

and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §3.03B.  Listing 3.00C states in pertinent part:

> C.  Attacks of asthma, . . . are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital emergency room or equivalent setting.  Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours.  The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs.  <u>For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.</u>

20 C.F.R. Pt. 404, Subpt. P, App. 1, §3.00C (emphasis added).  Teston lists the following evidence in support of her contention:  Exhibits **1F1, 1F2, 1F4, 1F5, 10F1, and 10F28.**

Exhibit **1F4-5** is an **April 11, 2001** visit to Ben Archer Health Center.  Tr. 124-125.  On that day, Teston complained of "fighting for air for days," shortness of breath, wheezing, and "tight[ness] in the chest."  Tr. 125.  Teston also reported a history of heavy smoking for thirty-eight years.  The nurse practitioner examined Teston and noted an oxygen saturation of 92-93%, copious mucous in her nostrils; postnasal drainage in her throat, no crackles appreciated; coarse breath sounds at bases, and "ill in appearance but not toxic."  *Id.*  The nurse practitioner assessed Teston with (1) acute/chronic bronchitis with exacerbation of asthma.  The nurse practitioner directed Teston to force fluids, prescribed an antibiotic, and a bronchodilator.

Exhibit **1F2** is an **August 16, 2001** visit to Ben Archer Health Center.  Tr. 122.  At that time, Teston presented with complaints  of "difficulty breathing " for one week.  The nurse practitioner noted Teston had adequate [oxygen] saturation, the examination revealed expiratory wheezing and a few coarse breath sounds.  The nurse practitioner assessed Teston as (1) nicotine dependence; (2) COPD (chronic obstructive pulmonary disease); and (3) acute bronchitis.  The

nurse practitioner recommended Teston stop smoking and treated her with an antibiotic, Medrol

Dosepak, and an inhaler.  The nurse practitioner advised Teston to return if she did not get relief

within twenty-four hours, otherwise, she was to return in four days.

Exhibit **1F1** indicates Teston returned  to Ben Archer Health Center for her follow-up on

**August 20, 2001**.  The nurse practitioner noted: "lungs– few wheezes, but improved."  Tr. 121.

The nurse practitioner assessed Teston as having asthmatic bronchitis.

Exhibit **10F28** is an **August 24, 2001** visit to Sierra Vista Hospital Emergency

Department.  Tr. 273.  Teston complained of dyspnea and chest pain with radiation to the left

arm, lasting three minutes.  Teston reported her symptoms of chest pain started about one year

prior to this visit, but claimed she had not told her primary care physicians about her symptoms.

The examination revealed Teston was in no distress.  The physician ordered an EKG, Chest x-ray,

and various laboratory studies.  The physician diagnosed Teston with "chest pain, rule/out cardiac

etiology."  *Id.*

Exhibit **10F1-2** is a **May 3, 2002** follow-up visit to Sierra Vista Hospital Emergency

Department. Tr. 249-250.  On **April 28, 2002**, Teston presented to the emergency room with

complaints of cough, thick yellow phlegm, shortness of breath with exertion, and wheezing.  Tr.

250.  The physical examination revealed coarse wheezing.  The physician assessed Teston with

bronchitis, tobacco habit, and history of pneumonia.  The physician advised Teston to stop

smoking and prescribed an expectorant, an antibiotic, and a bronchodilator.

**On May 3, 2002**, Teston returned for her follow-up visit.  Tr. 249.  The attending

physician noted Teston had bilateral wheezing and rales, directed her to continue with the

bronchodilator, and added Advair (a steroid/brochodilator combination intended for oral

inhalation).  The attending physician assessed Teston with asthmatic bronchitis and directed her to

return in two weeks.

A review of the proffered evidence indicates Teston suffers from asthma, but that it does

not rise to listing level severity as set forth in Listing 3.03B.   Accordingly, the Court finds that

Teston's contention that she meets Listing 3.03B is not supported by the evidence.[2]

Teston also contends she meets Listing 12.04 (Affective Disorders).  In support of her

contention, she cites to **Exhibit 4F**.  **Exhibit 4F** is Dr. Sosa's consultative evaluation.  Dr. Sosa,

a clinical psychologist, evaluated Teston on January 15, 2002.  Dr. Sosa performed a Mental

Status Examination, noting:

> Ms. Teston is an older looking, 44-year-old, white female.  She was casually dressed and well
> groomed.  Her mood and affect were normal.  The speech and stream of thought were clear
> and coherent.  Her judgment was not impaired.  She related well.  The memory was normal
> for both recent and remote events.  The patient appeared to be of at least average intelligence.
> Evidence to suggest the presence of perceptual deviations was not available.  She was well
> oriented in all three spheres.
>
> The patient stated that she has may physical problems and that standing and sitting creates
> a lot of pain in her back and lower extremities.  Her poor diet and lack of sleep aggravate the
> situation.  He (sic) suffers even when her shifts are only four to six hours long.

Tr. 196 (emphasis added).  Teston's history indicates "she led a life of partying, drugs, and

alcohol" ( Tr. 195) and had three DUI convictions (Tr. 196).  Teston also reported a history of

---

[2] Additionally, the record indicates Teston's treating physicians diagnosed her with bronchitis and
COPD (chronic obstructive pulmonary disease) on other occasions and recommended Teston stop smoking.
*See* Tr. 140 (February 27, 1997 visit to Ben Archer Health Center– diagnosed with bronchitis); Tr. 134
(November 11, 1998 visit to Ben Archer Health Center– diagnosed with COPD);  Tr. 136 (May 20, 1999
visit to Ben Archer Health Center– diagnosed with bronchitis); Tr. 149 (November 11, 1999 x-ray report
indicating "some degree of emphysema and COPD suspected"); Tr. 128 (December 8, 2000 visit to Ben
Archer Health Center– diagnosed with bronchitis); Tr. 127 (January 4, 2001 visit to Ben Archer Health
Center– diagnosed with bronchitis/chronic smoker); Tr. 147 (January 4, 2001 x-rays indicting "lungs are
hyperinflated but clear– no evidence of cardiopulmonary disease).  However, Teston does not meet Listing
3.02A (Chronic obstructive pulmonary disease) or Listing 3.03A (Chronic asthmatic bronchitis).

three hospitalizations for depression and three suicide attempts.  However, Teston reported she

was not presently suicidal.  Dr. Sosa's diagnosed Teston with (1) Axis I: Major Depression, **Mild**,

Recurrent, Per History; History of Alcohol and Drug Abuse; (2) Axis II: Dependent Personality

Disorder; (3)  Axis III: History of Scoliosis, Heart Disease, Asthma and Degenerative Joint

Disease; (4) Axis IV: Moderate; and (5) Axis V: GAF Scale Last 12 Months– 40.

Although Dr. Sosa assigned Teston a GAF score of 40, his evaluation does not support

this level of functioning.[3]  Additionally, Dr. Sosa did not explain the GAF score he assigned

Teston and did not indicate Teston could not work.  Thus, Teston's GAF score does not relate to

her ability to work.  The Tenth Circuit has found that a GAF score, standing alone, without

explanation, does not establish an impairment severely interfering with an ability to perform basic

work activities.  *See, e.g.*, *Eden v. Barnhart*, No. 04-7019, 2004 WL 2051382 (10th Cir. Sept.

15, 2004)("No one who rated Mr. Eden's GAF indicated that he could not work.  Because a

score of **50** may not relate to Mr. Eden's ability to work, the score, standing alone, without

further explanation, does not establish an impairment severely interfering with an ability to

perform basic work activities."); *see also, Cainglit v. Barnhart*, 85 Fed.Appx. 71, 73 (10th Cir.

Dec. 17, 2003)(finding ALJ properly found claimant's depression did not significantly limit her

ability to work even though she twice received low GAF scores of **45** and **30** where the evidence

---

[3] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR). The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.  A GAF score of 40 indicates some impairment in reality testing or communication or major impairment in several areas.  *Id.*

indicated her depression did not impair her intellectual functioning, she had a good work history and she was able to live independently).

Finally, Teston does not point to any other evidence to support her contention that she meets Listing 12.04, and the Court has found none.  In fact, on March 21, 2000, Teston's treating physician noted he had treated her with Paxil.  Tr. 131.  On that day, Teston returned for a follow-up of her depression. Teston and her husband reported the Paxil was working well.  The physician's diagnosis was "**depression resolved/stable**."  *Id.* (emphasis added).  Additionally, Teston noted in her April 20, 2002 Daily Activities Questionnaire: "<u>When not on medication</u> I am very depressed, suicidal, self-destructive, anxious."  Tr. 97 (emphasis added).  This corroborates her statement to her treating physician that Paxil worked well for her depression.  Accordingly, the Court finds that the ALJ's finding that Teston did not meet Listing 12.04 is supported by substantial evidence.

Although Teston's "Notice"(Tr. 111-113) did not include a claim that she was disabled under Listing 1.05C, Teston raised this issue in her Memorandum in Support of Motion to Reverse or Remand Administrative Agency Decision.  In her memorandum, Teston cited to specific exhibits to support her contention that she meets Listing 1.05C.  *See* Mem. in Support of Mot. at 6.  Listing 1.05C addresses **Amputation**, due to any cause, of one hand and one lower extremity, at or above the tarsal region, with inability to ambulate effectively.  *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, §1.05C.  Because there is no evidence to indicate Teston has had an amputation of a hand or a lower extremity, the Court will assume that Teston mistakenly cited to this listing. A review of the exhibits listed by Teston in her memorandum appear to be the same exhibits she listed in her "Notice" to support her contention that she met Listing 3.03B.

**B.  Treating Physician Opinion**

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  "Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors  provided in [§] 404.1527.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)(quoting Social Security Ruling 96-2p, 1996 WL 374188, at *4).  A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is supported by objective medical evidence.  20 C.F.R. § 404.1527(d) (1)-(6).  If the physician's opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected.  *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988). Moreover, a treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth. *Byron v. Heckler*, 742 F.2d 1232 (10th Cir. 1984).  "'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments,

speculation or lay opinion.'"  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.

2002)(quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).

Teston contends the ALJ disregarded her treating physicians' opinions that she was

disabled.  According to Teston, Drs. DeMeter and Sosa opined she was disabled.  In his decision,

the ALJ found:

> The record includes two medical statements regarding the claimant's ability to work.  Dr. Foster prepared a brief note on January 25, 2002, when he first started treating the claimant, stating that she was 100% disabled because her left hip was "worn out" and she had left shoulder arthritis.[4]  He then administered several injections and reported shortly thereafter that the claimant was doing considerably better (Exhibit 5F).  Dr. Andrea DeMeter, another treating physician, wrote on October 3, 2001, that the claimant had a Class III cardiac impairment and it was against her best interests to perform any activities that would decompensate her congestive heart failure.  She recommended refraining from any job performance for at least six months.  Just a few weeks later, however, on October 17, 2001, Dr. DeMeter wrote to Dr. Leon that she had examined the claimant and she seemed to be doing quite well from a symptom standpoint and denied any chest pain, shortness of breath with exertion, nocturnal dyspnea or leg swelling.  She reduced the claimant's status to a Class I or II heart disease and she recommended a decrease in her medications.  The claimant herself then reported that she actually returned to at least part-time work in November 2001 (Exhibits 3E; 10F:14/16).  In view of the claimant's obvious improvement with treatment, and her actual return to work, I cannot accord significant weight to these work restriction statements from Drs. Foster and DeMeter.
>
> From a mental standpoint the record shows that the claimant can perform at least low-stress, repetitive work.  She told Dr. Sosa in January 2002 that she had been hospitalized on three previous occasions for suicidal attempts, but she denied any current suicidal thoughts and has received little documented treatment for depression since her alleged disability onset.  Dr. Sosa rated her GAF at 40, but his own clinical findings do not justify this low score.  He reported that the claimant's functioning was fully intact in terms of her orientation, memory, speech, thought content and judgment.  Her memory and affect were normal and she exhibited no evidence of perceptual disturbance.  Dr. Sosa himself diagnosed her depression as mild.  The evidence is consistent with an ability to do at least simple, unskilled work (Exhibit 4F).

Tr. 18 (emphasis added).  Teston correctly points out that Dr. Sosa is not considered a treating

physician in this case.  Under the regulations, he is considered a "nontreating source."  *See* 20

C.F.R. § 416.902.  A nontreating source means "a physician, psychologist, or other acceptable

---

[4] Teston does not challenge the ALJ's findings regarding Dr. Foster's statement of disability.

medical source who has examined [claimant] but does not have, or did not have, an ongoing treatment relationship" with the claimant. *Id.* This term includes an acceptable medical source who is a consultative examiner for the agency, when the consultative examiner is not a claimant's treating source. *Id.* Thus, Dr. Sosa's opinion is not entitled to controlling weight. Moreover, Dr. Sosa opined Teston suffered from **mild** depression. The Court finds that the ALJ accorded the proper weight to Dr. Sosa's opinion. Moreover, substantial evidence supports the ALJ's finding that Dr. Sosa's low GAF score of 40 was not supported by "his own clinical findings."

Teston also contends the ALJ disregarded Dr. DeMeter's finding of disability. The ALJ's decision indicates that, on October 3, 2001, Dr. DeMeter opined Teston had "a Class III cardiac impairment and it was against her best interests to perform any activities that would decompensate her congestive heart failure." Tr. 18. Dr. DeMeter recommended Teston refrain from "any job performance for at least six months." *Id.*[5] The record indicates as follows:

On August 24, 2001, at approximately 2:00 a.m., Teston presented to the emergency room at Sierra Vista Hospital in Truth or Consequences with complaints of acute dyspnea. Tr. 277. Dr. DeMeter attended Teston while at Sierra Vista Hospital. Dr. DeMeter monitored Teston's condition and conferred with Dr. David Lu, a cardiologist located in Las Cruces. After Drs. DeMeter and Lu decided that Teston possibly had an acute coronary syndrome, Dr. DeMeter transferred Teston to Memorial Medical Center (MMC) in Las Cruces so Dr. Lu could take over Teston's care. Tr. 264. Dr. DeMeter transferred Teston at approximately 1:00 pm.

---

[5] The Court has meticulously reviewed the record and did not find Teston's October 3, 2001 visit to Dr. DeMeter. Teston and the Commissioner refer to this visit in their pleadings and cite to the ALJ's decision. However, the ALJ failed to cite to the record when he discussed this visit in his decision. However, it is clear from the ALJ's decision that this document was before him at the time of his ruling.

Dr. Lu and Dr. Guido Leon, also a cardiologist, attended Teston during her hospital stay at MMC.  Tr. 153.  The electrocardiogram showed "a left bundle branch block at the rate of 65." Tr. 155.  Dr. Lu opined Teston's problem was more congestive heart failure rather than ischemic chest pain and ordered a coronary angiography.  Dr. Lu performed a "left heart catheterization, selective coronary arteriography, and left ventricular cineangiography."  Tr. 156.  Dr. Lu's impression was that Teston had "dilated cardiomyopathy."  Tr. 157.  Dr. Lu recommended "CHF (congestive heart failure) treatment."  *Id.*

On August 27, 2001, Teston was discharged.  The discharge summary indicates:

> The patient was transferred from ICU in [T or C] after admission with chest pain, dyspnea & an elevated CPK MB of 13%.  she had a heart catheterization that showed no epicardial Coronary Artery Stenosis.  She does have dilated Cardiomyopathy with Left Ventricular End-diastolic Pressure of 26mmHG & Ejection Fraction of 20%.  She had a 7-beat run of fast Ventricular Tachycardia.  Her Magnesium & Potassium levels were normal. She was started on Coreg to treat her V-Tach. & cardiomyopathy.

Tr. 182.  The discharge summary also indicates the attending physician recommended Teston start walking around her house 2-5 days, then walk outside twice a day.  The physician advised Teston to increase her walking to one-half hour twice a day.   Teston was scheduled to return to see Dr. Demeter in 1-2 weeks and Dr. Leon, a cardiologist, in four weeks.

On September 17, 2001, Teston returned for her follow-up with Dr. DeMeter.  Tr. 263. Dr. DeMeter noted Teston was improving.  Teston was walking four to five blocks daily but experienced fatigue and shortness of breath towards the end of her walk  Dr. DeMeter classified Teston's condition as **NYHA Classification II-III**.  Dr. DeMeter advised Teston to continue with her medications and return in one month.

On September 19, 2001, Dr. Leon evaluated Teston.  Tr.208-209.  Teston reported she was feeling much better and denied any shortness of breath, edema of her lower extremities,

paroxysmal nocturnal dyspnea, or orthopnea (difficulty breathing lying down).  The examination was essentially negative except for edema of the extremities.  Tr. 209.  Dr. Leon ordered a resting MUGA study (used to assess the pumping efficiency and motion of the heart) and sent Dr. DeMeter his findings.  Dr. Leon diagnosed Teston with "stable dilated idiopathic cardiomyopathy."  *Id.*  Dr. Leon recommended Teston return in six months.

On October 2, 2001, Dr. Leon referred Teston for a resting MUGA study.  Tr. 192.  Dr. Leon ordered this study due to Teston's COPD and shortness of breath.  The results indicated, "Left ventricular motion appears unremarkable and the resting ejection fraction is 42%."  *Id.*

On October 17, 2001, Teston returned for a follow-up with Dr. Demeter.  Tr. 262.  Dr. Demeter wrote to Dr. Leon, informing him as follows:

> I had the pleasure of seeing Miss Nancy Teston in my office today for follow-up.  As you know she is a 46 year-old lady presently diagnosed with dilated cardiomyopathy of uncertain etiology, presumably Post viral.  She was started by you on Carvedilol, Prinivil, spironolactone, Lasix and potassium.  She seem to be doing quite well from symptoms standpoint.  She denies any chest pain, shortness of breath  with a (sic) exertion or other, although she hasn't really exercised in the past couple months.  She denies any paroxysmal nocturnal dyspnea and any leg swelling.
>
> On examination today her weight is 136 and a half pounds, her blood pressure is 106/50, her pulse is 72 and regular.  She has no JVD.  Her lungs are clear to auscultation.  Cardiovascular exam displays regular rate and rhythm without any murmurs, rubs, or gallops.  Her lower extremity (sic) display no edema.
>
> Resting MUGA scan on her current medication shows an ejection fraction of 42%.
>
> Impression:
> 1.  Dilated cardiomyopathy– She seems to be <u>doing quite well symptomatically</u> on the current regimen.  **She appears to be in NYHA class 1-2 now.**  I had a long discussion with the patient and her family and they have lots of questions in regards to her long-term outcome and a medication changes.  I believe that in the near future and if you so agree we can probably decrease and stop some of [her] medications like carvedilol, spironolactone and possibly even Lasix and potassium, one at a time, substitute carvedilol for metoprolol or atenolol, continue her on prinivil and follow her symptomatically.  I will be conferring with you and (sic) to her in the near future.

Tr. 262 (emphasis added).  Significantly, Dr. DeMeter classified Teston as "NYHA class 1-2 now."  The NYHA (New York Heart Association) Classification is a functional and therapeutic classification for prescription of physical activity for cardiac patients.  *See NYHA Classification, http://hcoa.org/hcoacme/chf-cme/chf00070.htm.*  The NYHA Classification includes the following: **Class I**: patients with <u>no limitation of activities</u>; they suffer no symptoms from ordinary activities; **Class II**: patients with <u>slight, mild limitation of activity</u>; they are comfortable with rest or with mild exertion; Class III: patients with marked limitation of activity; they are comfortable only at rest; and Class IV: patients who should be at complete rest, confined to bed or chair; any physical activity brings on discomfort and symptoms occur at rest.  *Id.*  A "NYHA Classification 1-2" is consistent with the ALJ's RFC determination that Teston retained the RFC to perform sedentary work.

On October 25, 2001, Dr. DeMeter, with Dr. Leon's concurrence, discontinued Teston's Lasix (diuretic), potassium, Coreg (carvedilol), and spironolactone (indicated for the treatment of congestive heart failure).  Tr. 261.  Dr. DeMeter kept Teston on Zestril (prinivil-antihypertensive) and ASA (aspirin). Coreg is indicated for the treatment of mild or moderate (NYHA II or III) heart failure.  *See Coreg Indications, Dosage, Storage, Stability- Carvedilol-RxList, http://rxlist.com/cgi/generic3/carvedilol_ids.htm.*

Substantial evidence supports the ALJ's finding that Dr. DeMeter's October 17, 2001 clinical notes did not support her statement of disability.  Accordingly, the ALJ accorded the proper weight to Dr. DeMeter's opinion and set forth specific legitimate reasons for rejecting her statement of disability.

## C.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

The ALJ found Teston not credible because " her testimony and other evidence [did] not credibly establish functional limitations to the extent alleged."  Tr. 16.  Teston claimed she suffered from "back, hip and shoulder pain, heart palpitations, dizziness, migraine headaches, fatigue, anxiety attacks, mood swings, fainting spells, irritability, decreased concentration, and an inability to sit or stand for any length of time."  *Id.*  Teston also testified she had been using a cane to assist her ambulation because of hip pain." *Id.*

The ALJ set forth the evidence that supported his credibility determination.  For example, the ALJ noted Teston had "respiratory and cardiac conditions which impose some degree of limitation in her physical functioning but not to a completely disabling degree."  Tr. 18.  Citing to the record, the ALJ noted, "[t]his improved significantly with medication to the extent that a subsequent test on October 2, 2001 indicated an ejection fraction of 42%.  The claimant told Dr. Leon, her cardiologist, on September 19, 2001, that she was feeling much better and denied any shortness of breath, lower extremity edema, or nocturnal dyspnea."  *Id.*  The ALJ also noted

Teston suffered from brief asthmatic exacerbations that responded to treatment.  As to her complaints of left shoulder and hip pain, the ALJ noted her x-rays were unremarkable and showed no evidence of acute bony injury or disease.  The ALJ further discussed Teston's Activities of Daily Living which did not support her claim of disability but did support an RFC for sedentary work.

It is clear from the ALJ's opinion that he discounted the significance of Teston's subjective complaints of disabling conditions because of a lack of objective corroborative evidence which is appropriate.  *See Diaz,* 898 F.2d at 777.  Accordingly, the Court finds that substantial evidence supports the ALJ's credibility determination.

**D.  ALJ's Consideration of Teston's Psychological Problems**

Teston contends the ALJ "did not seriously consider the mental components of this case." Mem. in Supp. at 9.  Teston relies on her history of emotional problems and three suicide attempts.  Teston also claims "[a] fair reading of Dr. Sosa's report suggests that the claimant's emotion (sic) problems are disabling."  *Id.* at 10.  The Court disagrees.  As previously noted, Dr. Sosa opined Teston suffered Major Depression, **Mild**, Recurrent.  The record also indicates Teston's depression was well controlled with Paxil.  The ALJ considered these factors.

**E.  Vocational Expert Testimony**

Teston also contends the ALJ erred in failing to include all her subjective complaints in the questions posed to the vocational expert (VE).  Teston argues the ALJ should have included her complaints that she "must lay (sic) down twice a day and that she has significant side effects from her medications."  Mem. in Supp. at 10.  Teston also claims she has problems concentrating and cannot perform the jobs the VE listed.  However, hypothetical questions need not take into

17

account all of a claimant's alleged impairments.  Questions to VE are proper when they take into account the impairments substantiated by the medical reports and the impairments accepted as true by the ALJ.  *See Gay v. Sullivan,* 986 F.2d 1336, 1340-41 (10th Cir. 1993); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990).  The Court finds the ALJ's hypothetical questions were proper based on his credibility assessment and the medical records.

**F.  Conclusion**

The Court's review of the ALJ's decision, the medical record, and the applicable law indicates the ALJ's decision adheres to applicable legal standards and substantial evidence supports the ALJ's determination that, despite her limitations, Teston retained the RFC to perform sedentary work.

A judgment in accordance with this Memorandum Opinion will be entered.


_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**